PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
07/22/99
THOMAS  K. KAHN
CLERK

_____

No. 98-8870

_____

D. C. Docket No. CR297-10-4

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

MARY JANE PEDRICK,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(July 22, 1999)**

Before HULL and MARCUS, Circuit Judges, and RONEY, Senior Circuit Judge.

HULL, Circuit Judge:

The Government appeals the district court's order granting Defendant Mary Jane Pedrick's motion for a new trial. After review, we affirm.

## I. BACKGROUND

Pedrick was tried jointly with co-defendant Andrew Shankman, M.D. Pedrick and Shankman were charged jointly with one count of conspiracy to defraud Medicare, Medicaid, and CHAMPUS[1] in violation of 18 U.S.C. § 371 (Count 1) and eighty-nine counts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 (Counts 2 to 90). In addition, Shankman alone was subject to ten counts of unlawfully dispensing controlled substances in violation of 21 U.S.C. § 841(a)(1) (Counts 91 to 100) and twenty-five counts of money laundering to promote the scheme to defraud in violation of 18 U.S.C. §§ 2 and 1956(a)(1)(A)(i) (Counts 101 to 125).

Shankman was a psychiatrist who owned and operated Shankman/Davidson Psychiatric Management, Inc. ("SDPM"), along with co-defendant Thomas Davidson.[2] Pedrick was a therapist who worked for Dr.

---

[1] CHAMPUS is the Civilian Health and Medical Program of the Uniformed Services.

[2] Co-defendants Thomas Davidson and Michael Davidson were charged in the same indictment as Pedrick and Shankman, but pleaded guilty prior to trial. Both Davidsons were charged with a total of 156 counts: one count of conspiracy (Count 1), eighty-nine counts of mail and wire fraud (Counts 2 to 90), and sixty-six counts of money laundering (Counts 101 to 166). Thomas Davidson's plea agreement with the Government required him to plead guilty to only seven counts: one count of conspiracy (Count 1), three counts of mail fraud (Counts 2, 28, and 86), two counts of wire fraud (Counts 56 and 72), and one count of money laundering (Count 101). Thomas Davidson received a total of 24 months' imprisonment for these counts. Michael

Shankman and SDPM.  Prior to trial, Pedrick moved to sever her case, alleging that she would suffer compelling prejudice if tried with her co-defendants, especially in light of the unlawful drug dispensation charges against Shankman. Pedrick's pre-trial motions for severance were denied.

During the four-day trial, the Government presented fifty-five witnesses[3] and introduced thousands of documents.  After deliberating for about three and a half hours,[4] the jury found Pedrick guilty of all 90 counts against her and Shankman guilty of all 125 counts against him.

Following the jury's verdict, the district court granted Pedrick's motion for a new trial but denied Shankman's similar motion.[5]  The district court granted Pedrick a new trial on these three grounds:  (1) while sufficient to preclude a judgment of acquittal, the evidence weighed heavily enough against the verdict to

---

Davidson's plea agreement with the Government required him to plead guilty to only one count of conspiracy (Count 1), for which he received 33 months' imprisonment. The more than 140 counts remaining against the Davidsons were dismissed.

SDPM also was named as a defendant in Counts 1 to 90 but was dismissed altogether from the indictment prior to trial.

[3] Ten other witnesses testified at trial.  Pedrick testified in her own defense and presented the testimony of three character witnesses.  Shankman also testified in his own defense and presented the testimony of five witnesses, mostly former patients.

[4] The trial transcript indicates that jury deliberations took place between 12:15 p.m. and 3:50 p.m. on June 27, 1997.

[5] After Shankman's separate motion for judgment of acquittal or for new trial was denied, the court sentenced Shankman to 87 months' imprisonment.  Shankman has appealed his sentence, and that appeal is proceeding separately.

require a new trial; (2) the Government's reliance on violations of civil regulations affected Pedrick's substantial rights; and (3) Pedrick did not receive a fair trial and suffered compelling prejudice as a result of being tried jointly with Shankman. The Government appeals the grant of a new trial to Pedrick.

## II. STANDARD OF REVIEW

A district court's decision to grant a new trial in a criminal case, like a decision to deny a new trial, generally is reviewed for clear abuse of discretion. United States v. Vicaria, 12 F.3d 195, 197 (11th Cir. 1994); United States v. Cox, 995 F.2d 1041, 1043 (11th Cir. 1993). Thus, we review for clear abuse of discretion the trial court's decision to grant a new trial based on the civil regulations and severance issues.

Where a court's decision is based on the weight of the evidence, however, the decision to grant a motion for new trial will be "more closely scrutinize[d]" than the denial of such a motion. Cox, 995 F.2d at 1043-44. This more stringent standard of review is to ensure that proper deference is given to a jury's factual determinations. Id. Consequently, we review under this more stringent abuse-of-discretion standard the trial court's decision to grant a new trial based on the weight of the evidence.

## III. DISCUSSION

After review, we find no clear abuse of discretion in the trial court's granting a new trial based on its finding that Pedrick suffered compelling prejudice in being tried jointly with Shankman. Our conclusion on severance pretermits the need to reach the other grounds relied on by the trial court.

A district court may grant a new trial when a defendant was unable to receive a fair trial and suffered actual, compelling prejudice as a result of a joint trial. See United States v. Cassano, 132 F.3d 646, 651 (11th Cir.), cert. denied, 119 S. Ct. 103 (1998). In determining whether the trial court abused its discretion in finding that Pedrick suffered such compelling prejudice, we examine the charges and evidence against Shankman versus those against Pedrick.

**A. Charges and Overwhelming Evidence Against Shankman**

In Count 1, Shankman was charged, along with his company SDPM, Thomas Davidson, Michael Davidson, and Pedrick, with conspiring to defraud the United States by obtaining money from government programs through false claims for services not rendered as claimed and for non-reimbursable services. In Counts 2 to 55 and 86 to 90, these same Defendants were charged with mail fraud due to their causing the reimbursement checks listed in the indictment to be sent from the government programs to SDPM's main office. In Counts 56 to 85, these same Defendants were charged with wire fraud for electronically

5

transmitting claims for reimbursement from SDPM's main office to the government programs and thereby causing those programs to issue to SDPM the reimbursement checks listed in the indictment. Shankman also was charged with unlawful drug dispensation, and he and the Davidsons were charged with money laundering.

The evidence presented against Shankman on these charges was so overwhelming in quantity and egregious in quality that it explains why the district court found that Pedrick had suffered compelling prejudice as a result of being tried jointly with Shankman.[6] The Government offered substantial evidence of Shankman's knowledge about and involvement in SDPM's submission of false claims to defraud and obtain money from the government. As an owner of SDPM, Shankman participated in policy decisions about how SDPM's main office would bill the government for his and the therapists' services and oversaw the main office's preparation and submission of claims to the government programs. These claims were all submitted in Shankman's name, and the checks SDPM received from the government programs were made out to either Shankman or SDPM.

---

[6] In his pending, separate direct appeal, Shankman raises only sentencing issues. United States v. Shankman, No. 97-9154 (11th Cir. filed October 16, 1997).

The Government introduced evidence that Shankman continued to permit SDPM's main office to submit claims to the government fraudulently billing therapists' services. In 1990, an administrative law judge ordered Shankman to return $114,255.75 to Medicaid for "psychotherapy" services provided by SDPM therapists in nursing homes. Again, after a 1993 audit, Shankman repaid Medicaid $10,979.95 for improperly billing the SDPM therapists' services. In March 1992, Shankman also had been indicted in Glynn County, Georgia, for billing Medicaid for services rendered by therapists who were not employed by SDPM or Shankman. The indictment was nolle prossed, however, as a result of a 1995 settlement agreement, in which Shankman agreed to pay Medicaid $31,774.80.

The Government also submitted extensive evidence that Shankman routinely submitted false claims to the government for his own services. Shankman openly falsified his flow sheets and patient records in order to double-bill the government for services he and a therapist provided to a patient on the same day. The government programs reimbursed for only one psychiatric service per patient per day. To collect for both his and the therapists' services, Shankman would claim to have provided his service on a different date than the therapist's service. Shankman also would bill for a full session even though he had only spent a few minutes with a patient or talked briefly to a patient on a

7

phone. Many times when Shankman saw patients for only a few minutes, he wrote prescriptions for them, and then billed for interactive individual psychotherapy, using CPT code 90855.[7] Shankman used 90855 because it paid well, even though the code was not for writing prescriptions, but for psychotherapy provided to patients who could not communicate verbally.

There was also significant evidence introduced about Shankman's dispensation of controlled substances that could have biased Pedrick's case.[8] Because he saw patients for only a few minutes, Shankman often wrote prescriptions without obtaining any medical or psychiatric histories or determining the medical necessity of the drugs. Nearly all of Shankman's patients walked out of his office with prescriptions.

Several former patients gave graphic testimony about both the ease with which they could obtain prescriptions from Shankman and the disastrous results, including overdoses and suicide attempts. For example, one former patient, T.P., testified that she was a drug addict, looking for some pills, and that Xanax was

---

[7] CPT codes are five-digit numerical codes that correspond to verbal descriptions set forth in Physicians' Current Procedural Terminology, a manual produced by the American Medical Association. Other CPT codes relevant to this case include 90843, which signifies twenty to thirty minutes of individual psychotherapy, and 90853, which indicates group psychotherapy.

[8] Under 21 U.S.C. § 841(a)(1) and 21 C.F.R. § 1306.04, it is illegal for a practitioner such as a psychiatrist to issue a prescription for a controlled substance without a legitimate medical purpose and outside the usual course of his professional practice.

her "drug of choice." She learned about Shankman from a friend. During her first appointment, T.P. estimated that she spent two to three minutes with Shankman. T.P. informed him that she felt depressed and anxious, that she had taken Xanax before, and that the Xanax had helped her. Shankman did not ask T.P. any questions relating to her history of drug abuse and did not obtain any other information about her medical or psychiatric history, but did prescribe both Xanax and Prozac for T.P. on that first visit. T.P. went back to Shankman for Xanax prescriptions several times after her initial visit. One time T.P. obtained 100 to 200 Xanax pills from Shankman in two weeks' time by telling him that she had dropped some of her pills in a mud puddle. Shankman also continued to write Xanax prescriptions for T.P. even though, as a result of the medication, T.P. had a seizure, experienced blackouts, became violent, and was sent to jail after being involved in a high speed police chase that ended in a car accident. T.P. even called Shankman from jail and had him send Xanax and Restoril prescriptions to her through the prison authorities.

The evidence about how Shankman spent the money SDPM obtained from the government was equally powerful and again could have caused undue prejudice to Pedrick.[9] Thomas Davidson and Shankman, as co-owners of SDPM,

_____

[9] Under 18 U.S.C. § 1956(a)(1)(A)(i), it is unlawful for an individual knowingly to conduct or attempt to conduct a financial transaction which involves the proceeds of some form of unlawful activity, "with the intent to promote the carrying on of [the] specified unlawful

used $158,286.70 in billing-fraud proceeds to make loan payments for two airplanes. Although the planes were used primarily for flying Shankman between SDPM offices, SDPM's pilot also testified to using these planes to fly Shankman to the U.S. Open in New York on two occasions and to fly Thomas Davidson and his family on two trips to Nassau in the Bahamas. The Government also presented evidence that Shankman and Thomas Davidson used proceeds from SDPM's billing to purchase a boat and to purchase or lease luxury automobiles--between the two of them, they had four BMWs and two Mercedes. SDPM also paid many of Shankman's personal expenses such as phone bills, power bills, and credit card charges. In addition, Shankman reported receiving $206,687 in income from SDPM in 1994.

## B. Charges and Evidence Against Pedrick

Although not charged in the money laundering or drug dispensation counts, Pedrick was charged in the one count of conspiracy to defraud and obtain money from the government and the eighty-nine counts of mail and wire fraud. Except for Pedrick, none of the thirty therapists working for Shankman was indicted, even though SDPM fraudulently billed the government for their services as well.

---

activity."

Though Shankman ran SDPM's clinical operations, the Government stressed that in 1993 Pedrick was promoted to "Vice President of Clinical Operations." Pedrick had only a limited managerial role in clinical services and no involvement with SDPM's billing. Pedrick also had no ownership interest in SDPM but was a salaried employee making $46,501 annually as of 1994. Pedrick received no salary increase or increased duties with this promotion.[10] Pedrick also received no bonuses, dividends, or profits from SDPM. Just like the other therapists, Pedrick saw patients in nursing homes and SDPM's twelve offices in Georgia and Florida. Five days a week, Pedrick traveled to see patients from 6 or 6:30 a.m. until after 7 p.m. The Government does not dispute that Pedrick mainly spent her time seeing patients.

More importantly, the evidence also showed without dispute that Pedrick was not involved in SDPM's billing. SDPM had two divisions: administrative operations and clinical services. Thomas Davidson headed the administrative, financial, and billing operations, while Shankman ran the clinical services. Thomas Davidson's son, Michael Davidson, also worked in administrative

---

[10] At some point, Pedrick did receive a leased vehicle to drive at a monthly cost to SDPM of $614 for a Camry and later $586 for a BMW. One other therapist received a SDPM vehicle, a Geo Prizm. However, the rest of the therapists did receive a $300 monthly travel allowance, which Pedrick did not receive. Pedrick also had a company American Express card for business and travel expenses, but there was no evidence that SDPM improperly paid personal expenses for Pedrick.

operations, and eventually became "Vice President of Administrative Operations" and supervised the manager and three clerks in the billing department. Pedrick never worked in the administrative division, never prepared any bills, never transmitted any bill by mail or electronically, and never received, handled, or even saw the reimbursement checks. The Davidsons, who both testified for the Government, never contradicted the fact that Pedrick was not involved with the actual billing.

Instead, all billing for clinical services was done from SDPM's main office in Georgia. That SDPM office provided each therapist, including Pedrick, with daily flow sheets. For nursing home patients, the main office pre-printed patients' names on the flow sheets, so therapists simply had to check off which patients were seen and note whether seen individually or in group. For office patients, the therapists filled in the patients' names and the services provided. Each work day, the therapists faxed or delivered their flow sheets to the main SDPM office.

After reviewing the flow sheets, the administrative staff prepared the claims, selected the CPT codes, and mailed or wired claims to the appropriate entity. SDPM received remittance, electronically or by check, payable to SDPM or Shankman.

Although Shankman sometimes wrote CPT codes on his flow sheets, Pedrick and the other therapists did not write CPT codes on their flow sheets, as billing instructions were never given to the therapists. Even though the therapists' flow sheets also never referenced "psychotherapy," SDPM's main office routinely used the CPT codes for individual and group psychotherapy in submitting claims for their services. The government programs pay for psychotherapy only if provided by an authorized, licensed physician-psychiatrist, doctoral-level psychologist, or master's-level clinical social worker.[11] Pedrick and most SDPM therapists had the requisite master's degrees but were not licensed. Thus, SDPM's main office submitted claims for the therapists' services under Shankman's name.

Conceding Pedrick had no involvement with billing, the Government sought to establish that Pedrick knew SDPM used fraudulent billing codes and that she aided Shankman and the Davidsons' scheme to obtain money from the government. The Government's main evidence against Pedrick was that she was present when Shankman had an hour-long meeting with a Medicaid fraud investigator in July 1989. The fraud investigator advised Shankman that he was

---

[11] The Georgia Medicaid program would reimburse for diagnostic interviews and for testing by unlicensed therapists, but only if those services were rendered under the direct supervision of a licensed physician-psychiatrist. However, Shankman often was not in the same office or nursing home as the therapists.

13

improperly billing Medicaid for psychotherapy by therapists in nursing homes. An administrative law judge later ordered Shankman to pay back $114,255.75 to Medicaid.

Pedrick believed the matter had been resolved when Shankman paid the fine; she did not know that SDPM was continuing to bill Medicaid for therapists' services. SDPM's main office told Pedrick that they billed only Medicare, not Medicaid, for the services the therapists provided, and that such billing was proper. Michael Davidson also admitted telling at least one therapist that therapists' services were billable to Medicare even if not to Medicaid. Several former SDPM therapists also testified that they believed SDPM could bill Medicare for their services.

The fraud investigator testified that she did not see Pedrick at any subsequent investigation-related proceeding. There also was no evidence that Pedrick attended any meetings or had any knowledge of the subsequent audit of Shankman and 1993 sanctions or of Shankman's 1992 indictment and 1995 settlement agreement.

At trial, the Government also stressed that Pedrick must have known her services were being billed to Medicaid because when she saw a new patient, she would submit to SDPM's main office a form showing which entity should be billed. At times, Pedrick attached to her flow sheets copies of patients' Medicaid

14

eligibility forms or new patient forms with Medicaid numbers.  However, all therapists submitted these forms, as SDPM could bill Medicaid for Shankman's services to those patients.

In addition, the Government emphasized that Pedrick submitted flow sheets  showing on occasion she saw a large number of patients in one day.  The Government argued that Pedrick could not actually have seen so many patients, but Pedrick explained that she could do so because she conducted group therapy.  For the most part, Pedrick did see all patients indicated on her flow sheets.  There also was no evidence that Pedrick changed any dates on her flow sheets.

The Government also focused on Pedrick's improper note-keeping in her patients' charts.  Pedrick's therapy notes for a few patients had entries representing that Pedrick treated those patients on dates after the patients had died.[12]  However, these were isolated incidents, which Pedrick conceded arose from the large number of patients she saw.  Pedrick also has admitted that she was sometimes two to three weeks behind in her notes and thus at times wrote

---

[12] In the three-year period from 1993 to 1995, SDPM had twenty-seven instances of flow sheets being submitted showing a patient who had recently died had been seen.  Although the FBI Agent who analyzed the flow sheets testified about several instances attributable to Pedrick, he admitted that therapists other than Pedrick also made this error.  For example, the Agent attributed three of the twenty-seven instances to Shankman, six to therapist Carri Scott, and two to therapist Cindy Leasure.

one note for multiple dates of services for a patient, instead of writing a separate note for each date.[13]

Lastly, the Government stresses that Pedrick did negotiate a contract for SDPM therapists to provide group therapy at one nursing home and did some initial training of therapists, particularly regarding how to make notes in patients' charts. Shankman also instructed the other therapists to take their questions and problems to Pedrick, as opposed to bothering him. However, there was no evidence that Pedrick reviewed other therapists' flow sheets or had anything to do with the billing for other therapists' work. Instead, any "management" role was only on the clinical side, and even that was extremely limited, as Shankman continued exclusively to approve therapists hired by Thomas Davidson, to assign patients to therapists, and to give therapists their work schedules.

In summary, the evidence against Pedrick was minimal and not like the overwhelming and vivid evidence against Shankman. More importantly, there was considerable direct evidence that Pedrick did not prepare or submit any bills to the government programs, did not know about CPT codes, never claimed to

---

[13] In addition, therapist Michael Easton died, and Pedrick filled in notes for about nine patients Easton had seen. Pedrick made no effort to conceal the fact that she wrote the notes, but testified that she did so because she knew that Easton already had submitted flow sheets and that SDPM's main office already had billed for these patients.

have provided psychotherapy, and had only limited managerial responsibilities over SDPM's clinical services.

While there may have been sufficient evidence against Pedrick to submit the conspiracy charge to the jury, it is not at all clear that there was sufficient evidence on all eighty-nine mail and wire fraud counts.[14] Each mail and wire fraud count corresponded to a check a government program sent to SDPM as a result of a claim submitted by the administrative staff in SDPM's main office. It was not clear which of these checks, if any, involved reimbursement for Pedrick's services. Moreover, although Pedrick did submit flow sheets for SDPM's administrative staff to use in billing for her services, Pedrick's flow sheets did not contain CPT codes, directions to bill her services as psychotherapy, or instructions to bill her services to the government programs. Instead, Shankman and the Davidsons decided on the CPT codes SDPM would use, and SDPM's administrative staff applied those CPT codes to Pedrick's services, prepared the claim forms, and mailed or wired those claims to the government programs.

## C. District Court's Compelling Prejudice Determination

---

[14] Because Pedrick did not cross-appeal the denial of her motion for judgment of acquittal, we do not address whether the district court properly denied that motion. We raise the issue of the sufficiency of this evidence only insofar as it relates to whether the jury adequately sifted the evidence on each count against each Defendant.

It was against this evidentiary backdrop that the district court granted

Pedrick's motion for a new trial. United States v. Shankman, 13 F. Supp.2d

1358, 1363 (S.D. Ga. 1998). Acting in accordance with the "'continuing duty at

all stages of the trial to grant a severance if prejudice appear[s],'" the district

court decided that Pedrick had suffered compelling, "spillover" prejudice as a

result of being tried jointly with Shankman and that a new trial was warranted on

that ground. Id. at 1367-68 (citing United States v. Johnson, 478 F.2d 1129,

1134 (5th Cir. 1973) (quoting Schaffer v. United States, 362 U.S. 511, 516

(1960))). The district court observed that Defendants in this case had made pre-

trial motions for severance and that the magistrate judge had properly denied

those motions based on the record before the magistrate judge at that time. Id. at

1368. However, the district court stated that the situation had changed during the

trial, when "the overwhelming majority of the evidence presented by the

Government was directed at Shankman." Id. The district court found not only

that there was little evidence directed at Pedrick, but also that the great weight of

the evidence did not support her guilty verdicts. Id. at 1368. Further, because

the jury returned guilty verdicts on all of the counts against both Shankman and

Pedrick, the district court concluded that the jury had not heeded the court's

instructions that "[e]ach offense and the evidence pertaining to it must be

18

considered separately" and had not "meticulously sifted the evidence" against each Defendant. Id. at 1368-69.

## D. No Clear Abuse of Discretion

The Government's brief correctly emphasizes and we reaffirm the preference for joint trials of co-conspirators. See, e.g., United States v. Smith, 918 F.2d 1551, 1559 (11th Cir. 1990) (recognizing the preference for persons who are charged together to be tried together, "particularly in conspiracy cases"). The Government also stresses the elements of conspiracy and the fact that a person does not have to know everything to be part of a conspiracy. We agree and find axiomatic that a conspirator is not required to participate in all aspects of a conspiracy and may be convicted as a co-conspirator or even an aider and abettor if she participates in some affirmative conduct designed to aid the success of the venture with knowledge that her actions would further the venture. See, e.g., United States v. Suba, 132 F.3d 662, 672 (11th Cir. 1998). Indeed, the evidence need not show that each defendant knew of each phase of the conspiracy, all of its details, all of the conspirators, or the participants in each event. Id.

The Government's emphasis on these well-established principles misses the point here. In reviewing the district court's grant of a new trial based on the need for severance, the question is not whether we would reach the same decision utilizing these well-established principles and considering the evidence anew.

19

Rather, the question is whether the district court clearly abused its discretion in granting a new trial. The district court saw the witnesses, heard all of the evidence, and is in the best position to evaluate whether Pedrick suffered compelling prejudice warranting a new trial. Thus, for several particular reasons, we cannot say that the district court here clearly abused its discretion in finding that Pedrick had suffered compelling prejudice and granting her a new trial.

First, while it may not have been clear to the district court at the beginning that severance was necessary, it apparently became clear upon introduction of all the evidence about Shankman's drug prescription practices, Shankman's changing flow sheet dates, and Shankman's and Thomas Davidson's planes, cars, and other lavish expenditures. The record was loud and clear as to Shankman's and the Davidsons' participation in the billing fraud and other crimes. The Government's brief accurately characterizes the evidence as being "in glorious testimonial color and documentary detail, the bizarre world of Shankman/Davidson." The Government's own statement acknowledges the inflammatory nature of the evidence against Shankman and serves as a tacit admission of the resulting prejudice to Pedrick. Pedrick, while not necessarily innocent, was not in the same league as her co-defendants. The Government even concedes that Pedrick's role was minor compared to Shankman's and that there was no direct evidence of Pedrick's knowledge about either the billing

20

codes or Shankman and Thomas Davidson's financial activities. Moreover, the evidence introduced on the drug dispensation and money laundering charges had nothing to do with Pedrick.

Second, despite the district court's jury instructions, it is clear from this particular record that the jury did not adequately sift all this evidence and make an individualized determination as to Pedrick. See United States v. Schlei, 122 F.3d 944, 984 (11ᵗʰ Cir. 1997) (explaining that a defendant can demonstrate compelling prejudice as a result of a joint trial "by showing that the jury was unable to sift through the evidence and 'make an individualized determination as to each defendant'"), cert. denied, 118 S. Ct. 1523 (1998); United States v. Alvarez, 755 F.2d 830, 858 (11ᵗʰ Cir. 1985) (stating that "we must decide whether the jury could follow the district court's cautionary and admonitory instructions and determine the guilt or innocence of each defendant solely on the basis of that defendant's conduct"). The jury deliberated for only about three hours and returned guilty verdicts on all 90 counts against Pedrick and all 125 against Shankman. Cf. United States v. Cassano, 132 F.3d 646, 651-52 (11ᵗʰ Cir.) (concluding the jury made individualized determinations as to each defendant in a conspiracy case with a verdict acquitting one defendant on all counts, another on all but two counts, and every other defendant on all but one count), cert. denied, 119 S. Ct. 103 (1998); Schlei, 122 F.3d at 984 (concluding

21

the jury made individualized determinations as to each defendant in a conspiracy case with a verdict acquitting one defendant on eight of the counts against him and another defendant on all counts). Indeed, as already mentioned, it is questionable whether there was sufficient evidence against Pedrick to establish her involvement in all eighty-nine counts of mail and wire fraud. There was absolutely no evidence that Pedrick reviewed other therapists' flow sheets, knew CPT codes, prepared any of the claims SDPM's main office submitted to the government programs, mailed or wired any claims to the government programs, or received any reimbursement checks from the government programs. Given these particular circumstances, the jury's finding Pedrick guilty on all counts charged demonstrates that the jury did not sift the evidence and make an individualized determination as to Pedrick.

## VI. CONCLUSION

For the foregoing reasons, the district court's order granting Pedrick's request for a new trial is AFFIRMED.