[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-11196

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 23, 2007
THOMAS K. KAHN
CLERK

D.C. Docket No. 02-00586-CR-4-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

ADAN GIL MIRANDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 23, 2007)

Before DUBINA and WILSON, Circuit Judges, and HODGES,* District Judge.

HODGES, District Judge:

_____

*Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of
Florida, sitting by designation.

Adan Gil Miranda was convicted by a jury of conspiracy to distribute methamphetamine and cocaine (21 U.S.C. § 846); possession with intent to distribute both drugs (21 U.S.C. § 841); and possession of two firearms in relation to a drug trafficking crime (18 U.S.C. § 924(c)). The district court, post verdict, granted Miranda's motion for a judgment of acquittal and treated his alternative motion for a new trial as moot.[1]

On a prior appeal, another panel of this Court disagreed with the district court's evaluation of the evidence, found it to be sufficient to sustain the jury's verdict, and reversed the entry of judgment of acquittal United States v. Miranda, 425 F.3d 953 (11th Cir. 2005) ("Miranda I").[2] The case was then remanded to the district court for a decision on the motion for a new trial predicated on alleged prosecutorial misconduct. In ordering a remand, this Court expressly disclaimed any opinion on the merits of that motion. Id. at 963.

After the remand the district court entered an order granting Miranda's motion for a new trial, and the United States has appealed that order. Two questions are

[1]The district court overlooked Federal Rule of Criminal Procedure 29(d) requiring a conditional ruling on a motion for a new trial when a post trial motion for judgment of acquittal is granted. This mistake was not brought to the district court's attention by counsel for either side.

[2]The facts are recited in detail in Miranda I and need not be repeated here except as necessary to a decision of the specific issues on this appeal.

2

presented: (1) Was the motion timely? (2) Was the prosecutor guilty of prejudicial misconduct?

### Standard of Review

We review a district court's grant of a motion for new trial for abuse of discretion.  Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004); United States v. Pedrick, 181 F.3d 1264, 1266 (11th Cir. 1999); and when attorney misbehavior is involved, "[t]his [C]ourt gives considerable weight to the district court's assessment of the prejudicial effect of the prosecutor's remarks and conduct." United States v. Cordoba-Mosquera, 212 F.3d 1194, 1198 (11th Cir. 2000) ( internal quotation marks and citation omitted).

*A.The Timeliness of Miranda's Motion for New Trial*

After the verdict had been received at the conclusion of the trial, Miranda orally moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and requested an extension of time to file a brief in support of his motion.  The district court granted the requested extension.  Miranda did not move at that time for a new trial pursuant to Federal Rule of Criminal Procedure 33, nor did he request an extension of time within which to make a Rule 33 motion.

Two months after the jury's verdict, Miranda filed a written "Motion for Judgment of Acquittal and Brief in Support" in which he moved "pursuant to Federal

Rule of Criminal Procedure 29, to acquit him of his convictions by a jury . . . ."The bulk of the motion and brief focused on his request for judgment of acquittal; however, Miranda also stated that "in the alternative, [he] should be granted a new trial." His prayer for relief exhorted: "WHEREFORE, for all of the reasons stated above Defendant Miranda prays that this Motion be granted and that he be acquitted on Counts One, Six, Seven and Eight, or, in the alternative, that he be granted a new trial."

The Government responded to Miranda's August 4, 2002 motion, focusing in large part on his arguments concerning the sufficiency of the evidence. The Government's response acknowledged that Miranda's August 4, 2002 motion requested a new trial on the grounds of prosecutorial misconduct, but simply noted that "the defendant's motion for new trial should be denied" because his contentions "are without merit." The Government also incorporated by reference a prior motion it had made seeking to "correct the record" concerning the merits of Miranda's prosecutorial misconduct claim. The Government did not raise any other defenses to, or otherwise address, the motion for a new trial.

Rule 33 of the Federal Rules of Criminal Procedure provides that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty." Fed. R. Civ. P.

33(b)(2).[3] Until late 2005, it was the law of this Circuit that the seven-day time limit of Rule 33 was jurisdictional. United States v. Renick, 273 F.3d 1009, 1019 (11th Cir. 2001) (per curiam). On October 31, 2005, however, the Supreme Court issued its decision in Eberhart v. United States, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005) (per curiam), which clarified the prior confusion concerning the meaning of Rule 33 that "was generated by the 'less than meticulous' uses of the term 'jurisdictional' in our earlier cases." 126 S.Ct. at 405 (quoting Kontrick v. Ryan, 540 U.S. 443, 454, 124 S. Ct. 906, 157 L. Ed. 2d 867 (2004)). According to Eberhart, the time-limit of Rule 33 has always been "an inflexible claim-processing rule," rather than a rule "governing subject-matter jurisdiction." 126 S. Ct. at 403. The timeliness requirement of Rule 33 is therefore a defense to be raised by the party opposing the motion for new trial, and it is a defense that can be waived. 126 S. Ct. at 407. In particular, "where the Government failed to raise a defense of untimeliness until after the District Court had reached the merits, it forfeited that defense." Id.

Miranda concedes that he did not file his motion for a new trial within Rule 33's seven-day time period, or request an extension, but waited more than two months after the conclusion of his trial and included it with his motion for judgment of

---

[3]Rule 33(b)(2) was amended effective December 1, 2005 to remove a court's authority to extend the time for filing a motion for new trial. This deleted provision is not relevant in this case because Miranda never requested an extension of time to file a motion for a new trial.

5

acquittal. Yet the Government never challenged in the district court the timeliness of Miranda's original motion. Instead, the Government focused on the substance of the motion, stating that Miranda's "contentions are without merit," and incorporating by reference its previously filed motion to correct the record concerning the allegations of prosecutorial misconduct.

Under these circumstances, it would appear that the Government might have waived its right to challenge Miranda's motion as untimely. Unfortunately, the answer is not that simple because the district court did not comply with the mandates of Rule 29(d) to conditionally decide Miranda's motion for a new trial at the same time it granted the motion for judgment of acquittal. Instead, the district court did not address the merits of the new trial motion until after remand, and after the Government had been afforded an opportunity to file a response which included a defense based on Rule 33.

There can be no doubt that had the district court ruled on Miranda's original motion for a new trial at the same time it ruled on the motion for judgment of acquittal, the motion for a new trial would have been conditionally granted, and the Government would have forfeited its defense under Rule 33 for failure to assert it. The district court placed controlling weight on that circumstance, and upon its own

6

noncompliance with Rule 29(d), in deciding that Miranda should have this motion heard.

We sympathize with the district court's distress concerning the manner in which these unfortunate events unfolded, but we nonetheless conclude that the motion for a new trial was untimely and that granting it was an abuse of discretion. It was, after all, Miranda's tardiness in making the motion - not that of the Government - that produces the result we reach. Indeed, prior to Eberhart, the untimeliness of Miranda's motion would have been jurisdictional under the law of this Circuit, and nothing that the district court or the Government might have done, or failed to do, could have altered that conclusion of the matter. Eberhart, to be sure, removed the jurisdictional bar of a late filed motion under Rule 33, but the time period allowed is still "an inflexible claim processing rule," and the time bar is available - under the holding of Eberhart - until the district court has reached the merits of the motion. To hold otherwise, as the district court did here, is contrary to Eberhart and an abuse of discretion. We repeat, for emphasis, that it was Miranda's initial failure to comply with the rule that precludes consideration of his motion.

## B. Prosecutorial Misconduct

Even if we determined that the motion for a new trial was timely and not time barred, we would still find it necessary to reverse the district court's decision on the

merits of the motion. We will therefore address the merits as an alternative basis for our ultimate holding.

There were several events during trial that factored into the district court's ultimate finding of prosecutorial misconduct.

### 1. Agent Cromer's Trial Testimony

Prior to trial, Miranda and his co-defendants filed a motion *in limine* to exclude the anticipated expert opinions of DEA Agent Cromer concerning, *inter alia*, the structure and organization of Mexican drug trafficking conspiracies and, in particular, that Mexican drug trafficking organizations generally do not allow persons to be present during drug transactions, including at stash houses,[4] unless those persons are part of the organization. During the briefing process, counsel for Miranda and counsel for co-defendant Hector Ubaldo Jacubo made clear their intention to rely on a "mere presence" defense - that they were simply in the subject apartment at the wrong time and were not aware of and did not participate in the drug trafficking organization.

The district court conducted a hearing on the motion and found that Agent Cromer was qualified to render an expert opinion on the organization, structure, and

---

[4]Miranda was arrested in an apartment which served as a drug stash house. See Miranda I, supra.

practices of Mexican drug trafficking organizations, but refused to allow the Agent to testify "that they won't let people be present if they are not part of the [Mexican drug trafficking] organization." The district court said:

> Things may change at trial, but as a part of the Government's case in chief I'm going to rule his testimony out. . . . Agent Cromer's testimony . . . that they won't let people be present if they are not part of the organization, would tend to permit the jury to leap over what I understand to be the law in this Circuit, and that is that mere presence is not sufficient for a conviction, and that's my ruling. . . . [A]s part of the case in chief, I find that his testimony would not be of assistance to the finder of fact. So the motions to exclude the expert testimony . . . are hereby granted.

At trial, the Government did not elicit testimony during its direct examination of Agent Cromer that violated the pretrial ruling in any way. At the conclusion of the direct examination, the prosecutor repeated his request to the district court to present the disputed expert testimony, primarily to counter statements Miranda's counsel made during his opening statement that Miranda "happened to be in the wrong place at the wrong time." The district court denied the Government's request.

During Agent Cromer's <u>cross-examination</u>, however, the following exchange took place between counsel for co-defendant Jacubo and Agent Cromer:

Q:     Now Agent Cromer, prior to the moment that you approached the closet where Jacubo was - -

A:     Yes, sir.

9

Q:     - - you had no idea that Mr. Jacubo even existed, did you?

A:     No, sir.

Q:     And you had no way of knowing how long he had been in the apartment; true?

A:     That's correct.

Q:     You have no way of knowing whether he had any involvement in the drug conspiracy you were trying to investigate?

A:     I didn't know who Mr. Jacubo was.

Q:     Right.  <u>So your view of him as a guilty person was premised entirely on the fact that you saw him in that closet when you were in that drug processing center?</u>  (Emphasis supplied).

A:     Just clearly because he was in the closet, no, sir.  The person in the closet is irrelevant.  But you look at the totality of everything that was going on, we knew the drugs came out of that apartment, and knowing from my experience that stash houses people only – only people closely associated with stash houses are going to be allowed to be in there, especially a processing center with a large quantity of drugs.  We didn't know at the time, but we believed drugs were in there.  And so Mr. Jacubo, he's in the apartment, he's in the apartment where there's clearly – the only furniture in the apartment is the couch and the T.V. and the chair in the front room.  There's no – there's no furniture or anything in there. He's back where all the drugs, the drugs cooking out in the microwave that's in the back bedroom and not in the kitchen –

Counsel for Jacubo then objected, stating that: "Your honor, I have to object. He's giving a closing argument now.  I have asked him a question and this isn't the answer to any questions that I asked."  Significantly, neither Miranda or any other

10

defendant objected on the basis that the question and answer contravened the district court's pre-trial ruling in limine.

Following some discussion about the exact phrasing of counsel's question, the district court stated: "The question was, your suspicion of him being guilty was based on the fact that you saw him in the closet when you were in the drug processing center." Government counsel then noted that Agent Cromer's answer was responsive to that question, and asked that Agent Cromer be allowed to finish his answer. The district court agreed, but the topic was abandoned after Agent Cromer offered no elaboration.

### 2. The Testimony of Co-Defendant Cuevas

Co-defendant Cuevas, the alleged ringleader of the drug trafficking conspiracy, previously pled guilty but refused to cooperate with the Government. He was then granted use immunity and compelled to testify at trial pursuant to 18 U.S.C. § 6003. During his direct examination, Cuevas testified, without objection, as follows:

Q:   Mr. Cuevas, did you ever discuss your drug business in front of people you did not trust?

A:   Not as far as I can remember and being sane.

Q:   Did you ever discuss your drug business in front of people who weren't involved in your drug business?

A:   Supposedly I wasn't very careful.

11

Q:    I guess you're here. That's true. (Emphasis supplied).

Cuevas also testified that he did not store drugs in large amounts, and that "if I had money or something, I tried to put it away so no one would see it." No one objected to this testimony.

### 3. Closing Arguments

In his closing argument, Government counsel referred to both the testimony of Agent Cromer and Cuevas:

> Now, the question, I think, was raised in opening, you know, Mr. Miranda just happened to be there, he was just watching t.v., and clearly that implication was raised in cross-examination. There's a couple of other things. He was there for the two other deals when Mojica Ramon, the taxi driver, delivered and picked up the cocaine. And as Sebastian Cuevas told you, he does not allow people to be around unless he trusts them and they're involved. And as Mr. Norton, [counsel for Jacubo] asked – or brought out from Special Agent Cromer, in Special Agent Cromer's experience as a DEA Agent they don't allow people in a stash house unless they are involved, particularly in this situation. They've already been ripped off once and they don't know who did it, and, as [defense counsel] Ms. Kelly touched on, this was the largest stash house in the organization. Over 15 kilograms. . . .

At this point, counsel for co-defendant Jesus Alvear Uribe objected to the characterization of the apartment as the largest stash house in the organization. The district court overruled the objection, stating: "The jury heard it. I'm going to let them sort it out. This is argument." None of the defendants objected to this portion

12

of the closing argument on the grounds that it either improperly summarized Agent Cromer's testimony or violated the district court's pre-trial ruling.

Later in summation, the Government again referred to the testimony of both Agent Cromer and Cuevas:

> He's [Jacubo] back there with the drugs. Think back to what Sebastian Cuevas told you. They don't allow people in the stash house unless they're involved. And what that part of the house looked like, the stuff wasn't hidden. It was out in the middle of the room, the microwaves, the blenders, the kilo presses, there were drugs on the floor, the scales were there, the guns were there. If you're conducting some kind of illegal activity and there are innocent bystanders around, just send them all the way to the back bathroom where the drugs are? Do you tell them to go past one toilet to get to the back toilet so they're as close as possible to the guns, the drugs? You don't know who stole your last batch of drugs. You don't know whether or not that person is going to tell the police. You just don't do that. Sebastian Cuevas told you and Keith Cromer told you in his experience they don't allow people into that stash house.

Again, none of the defendants objected to this summation, the district court did not *sua sponte* question the argument, and no defendant addressed it on rebuttal. Instead, counsel for Jacubo and counsel for Miranda each relied on their defense that their respective clients were "merely present" at the apartment and had nothing to do with the drug trafficking organization.

### 4. Discussion

13

"In reviewing a claim of prosecutorial misconduct, we must assess (1) whether the challenged comments were improper,[5] and (2) if so, whether they prejudicially affected the substantial rights of the defendant." United States v. Arias-Izquierdo, 449 F.3d 1168, 1177 (11th Cir. 2006); see also United States v. Gonzalez, 122 F.3d 1383, 1389 (11th Cir.1997); United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir.1995). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different." United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006), *petition for cert. filed,* (U.S. Dec. 19, 2006) (internal quotations and citations omitted). In other words, the misconduct must be "so pronounced and persistent as to 'permeate the entire atmosphere of the trial.'" United States v. Elkins, 885 F.2d 775, 787 (11th Cir. 1989).

---

[5] It is important to note that we, like the district court, must determine the issue of prosecutorial misconduct in the light of the district court's ruling in limine, as the law of the case. Whether the court was right or wrong it its evidentiary ruling in limine is not before us and is not decided. After the ruling was made it was binding on the prosecutor during the ensuing trial. We do note for future guidance, however, that the proffered opinion of Agent Cromer and the testimony of Cuevas may well have been relevant, in conjunction with all of the other evidence, for the jury's evaluation of whether Miranda was "merely" present (as he claimed) or "willfully" present (as he was charged). See Miranda I, 425 F.3d at 959 ("where large quantities of drugs are present a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders."); United States v. Lynch, 934 F.2d 1226, 1231 (11th Cir. 1991) ("We think that a jury may conclude that it would be unreasonable for conspirators openly to conduct a drug deal in the home of a someone not part of their conspiracy."). See also United States v. Alvarez, 837 F.2d 1024 (11th Cir. 1988) (admission of expert testimony of drug enforcement administration agent in response to hypothetical question that it would be more risky to drug-smuggling operation to use crew members who did not have knowledge of vessel's drug cargo than to use members with knowledge).

14

The district court found that the prosecutor's reference during closing argument to Agent Cromer's response on cross-examination that Mexican drug traffickers "don't allow people in a stash house unless they are involved, particularly in this situation," was improper because it violated the district court's pre-trial ruling prohibiting the Government from introducing such testimony. The district court also found that the prosecutor misstated the substance of Cuevas' testimony concerning the same subject, and that such misstatement was material and improper. The district court then concluded that these improper statements had a reasonable probability of changing the outcome of Miranda's trial.

After careful review, we have an abiding conviction that the prosecutor's comments were not improper. The district court's pre-trial ruling excluding Agent Cromer's expert testimony was clear: the Government could not introduce the evidence. The district court's ruling also made clear that if circumstances changed during the trial, she would reconsider her ruling and perhaps allow the testimony. At trial, the disputed testimony was not introduced by the Government; rather, co-defendant Jacubo's counsel asked the key question on cross-examination and opened the door through which Cromer passed, without objection by Miranda, and gave an entirely responsive answer which remained on the record and was available to all

counsel during closing arguments. The district court gave no indication that Cromer's testimony was either non-responsive or inappropriate, and did not raise the issue of the pre-trial ruling at any time prior to or during closing arguments. Nor did counsel for any defendant, including Miranda. Thus it is entirely reasonable for the prosecutor to have believed not only that he did not violate the district court's pre-trial ruling, but that the evidence had at last been admitted and was fair game - *i.e.* circumstances had changed. Moreover, no one, including the district court, raised any concerns when the prosecutor summarized this admitted evidence during closing. And, as the district court recognized, there is no evidence to suggest that Agent Cromer was coached, or that the prosecutor failed to inform him of the district court's pre-trial ruling. Moreover, we cannot find anything in the record to support the district court's finding that the prosecutor's comments misled the jury. Rather, the prosecutor was simply summarizing Agent Cromer's unchallenged and admitted testimonial evidence that the jury had already heard without objection.

Also, the verdicts in this case make clear that the jury did follow the district court's instructions, applied the correct standard for the "mere presence" defense and,

in fact, found co-defendant Jacubo not guilty on all charges based on the same "mere presence" defense as that asserted by Miranda.[6]

It is also noteworthy that the prosecutor's comments concerning Agent Cromer and Cuevas were limited to three isolated statements during a lengthy trial and closing argument. They were not extensive discussions repeated throughout the trial and closing, and two of the remarks were directed specifically at co-defendant Jacubo, not Miranda. We also find that there is no indication in the record that the prosecutor committed an intentional violation of the district court's pre-trial ruling or an intentional misrepresentation of Cuevas' testimony.[7]

Finally, as we discussed at length in Miranda I, there was ample admissible evidence to support Miranda's conspiracy convictions. Miranda knew several of his

---

[6]See, e.g., United States v. Gonazalez, 122 F.3d 1383 (11th Cir. 1997) (any error based on the prosecutor's misstatements during closing was cured by the district court which, as in this case, instructed the jury that the prosecutor's arguments were not evidence and the jury was to decide guilt based solely on the evidence.); United States v. Wilson, 149 F.3d 1298 (11th Cir. 1998) (finding no substantial prejudice based on prosecutor's closing argument in part because district court informed jury multiple times that lawyer argument is not evidence).

[7]With respect to Cuevas' testimony, the admitted misstatements by the prosecutor were both minor and unremarkable. Cuevas testified that "Not as far as I can remember and being sane," he did not discuss his drug business in front of people he did not trust. He also implicitly acknowledged that he did not discuss his drug business in front of people who were not involved in the business. During closing, the prosecutor described Cuevas' testimony by stating: (1) "Mr. Cuevas does not allow people to be around unless he trusts them and they're involved," and (2) "they [the conspirators] don't allow people in the stash house unless they're involved." The first statement is a fairly accurate recitation of Cuevas' testimony and cannot be held to be an intentional misrepresentation. The second statement reaches a bit further, but is also an appropriate inference to be drawn from Cuevas' testimony with respect to his own cautious habits.

co-conspirators and had a pre-existing relationship with co-defendant Cambras; he had been present in the apartment stash house and was believed to have lived there; on at least two prior occasions Miranda was in the apartment when drug transactions were discussed in front of him; a large quantity of methamphetamine and cocaine was found in the apartment, as well as equipment used to make, package, and disguise the narcotics; the one room Miranda ran into was the room which contained all of the narcotics, equipment, and firearms; and there was a pervasive smell of acetone in the apartment.[8]  See Miranda I, 425 F.3d at 961 ("In combination with the evidence of

---

[8]The district court discounted the pervasive smell of acetone.  According to the district court, acetone is commonly used as nail polish remover and therefore is not persuasive evidence that Miranda was aware of drug activities in the apartment.  This could possibly be true if there had been any evidence, or even a suggestion, that any sort of nail polishing activities took place at the apartment, or if any bottl
es of nail polish remover (full or empty), had been recovered from the apartment.  Instead, the only evidence submitted at trial was that the cans of acetone were used for drug trafficking activities.

The district court was also influenced by the fact that the evidence supporting Miranda's conviction was circumstantial, but, of course, it is the law of this Circuit that circumstantial evidence may have the same weight as direct evidence and is sufficient to prove a conspiracy offense.  "To prove participation in a conspiracy, the government must have proven beyond a reasonable doubt, even if only by circumstantial evidence, that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy."  Miranda I,, 425 F.3d at 959 (quoting United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir.  2005)) (emphasis added).  "Whether [the defendant] knowingly volunteered to join the conspiracy may be proven by direct or circumstantial evidence, including inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme."  Id.  Circumstantial evidence is also sufficient to support a conviction for possession of a firearm in furtherance of a drug trafficking crime.  Id. at 962; see also United States v. Timmons, 283 F.3d 1246, 1252 (11th Cir. 2002) ("the nexus between the gun and the drug operation can be established by the type of the drug activity that is being conducted, accessibility of the firearm, the type of weapon . . . proximity of the gun to the drugs or drug profits, and the time and circumstances under which the gun is found.").

Mr. Miranda's knowledge of the drug dealing at the apartment, his presence during drug transactions, his relationship with Mr. Cambray [a co-defendant and primary player in the conspiracy], and his conduct in attempting to prevent the officers from entering the room where the drugs were processed and stored, a rational jury could find from this conduct that Mr. Miranda knowingly and voluntarily joined the Cuevas conspiracy."). While the standard of review for a judgment of acquittal is more favorable to the Government than the abuse of discretion standard, see e.g., United States v. Hernandez, 433 F.3d 1328, 1335 (11th Cir. 2005), the fact that we previously found sufficient evidence to support Miranda's conviction must be given at least some consideration at this stage, particularly when we reached our decision without considering or even mentioning Agent Cromer's or Cuevas' testimony. For, "[w]hen the record contains sufficient evidence of guilt, any error is harmless." Eckhardt, 466 F.3d at 947. We disagree, therefore, with the district court's conclusion that the prosecutor's closing arguments influenced the outcome of Miranda's trial even if such arguments were improper.[9]

**Conclusion**

---

[9]Rather than granting a new trial, there are other remedies available to deal with prosecutorial misconduct that does not affect the outcome of the trial.

19

The order of the district court granting Miranda's motion for a new trial is **VACATED**. The case is **REMANDED** to the district court for adjudication of guilt upon the jury's verdict with imposition of sentence and entry of judgment to follow.