[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

---

**No. 04-15920**

---

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 14, 2005
THOMAS K. KAHN
CLERK

**D. C. Docket No. 02-00586- CR-BBM-1-4**

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

ADAN GIL MIRANDA,

Defendant-Appellee.

---

**Appeal from the United States District Court
for the Northern District of Georgia**

---

**(September 14, 2005)**

Before TJOFLAT, PRYOR and ALARCÓN[*], Circuit Judges.

**ALARCÓN, Circuit Judge:**

We must decide whether the district court erred in granting Adan Gil

---

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Miranda's motion for a judgment of acquittal. Mr. Miranda was convicted by a jury of the crimes of conspiracy to distribute methamphetamine and cocaine, possession with the intent to distribute at least 500 grams of methamphetamine on September 5, 2002, possession with the intent to distribute at least 500 grams of cocaine on the same date, and possession of a Lorcin .380 caliber semi-automatic pistol, and a Glock 9mm semi-automatic handgun, in relation to a drug trafficking crime.

In his motion for a judgment of acquittal, Mr. Miranda did not challenge the sufficiency of the evidence that demonstrates that his co-defendants conspired to possess with the intent to distribute at least five kilograms of cocaine, and at least 500 grams of methamphetamine in violation of 21 U.S.C. 846 (b)(1)(A)(iii) and 841 (b)(A)(viii).  Instead, Mr. Miranda contended that the evidence presented by the Government was insufficient to demonstrate that he was a member of the alleged conspiracy.

The Government seeks reversal of the judgment of acquittal on the ground that the District Court failed to draw all permissible inferences in favor of the jury's guilty verdict, and did not view the evidence in the light most favorable to the Government.  We reverse the judgment of acquittal because we conclude that the evidence was sufficient to demonstrate that Mr. Miranda was a member of the

2

conspiracy, and that he is guilty of the possession crimes that were committed in furtherance of the conspiracy.

**I**

A

The evidence, viewed in the light most favorable to the Government,[1] demonstrated that Mr. Sebastian Cambray Cuevas ("Mr. Cuevas") was the leader of a large-scale cocaine and methamphetamine drug-trafficking organization that operated in Atlanta. Through the use of wiretaps and surveillance, a DEA task force identified several members of Mr. Cuevas's organization including Jose Jaime Cambray ("Mr. Cambray"). Mr. Cambray's role in the conspiracy was to operate a stash house, to process methamphetamine, and to "cut" or dilute cocaine. A stash house is a place where drugs or money is stored by narcotics traffickers. Mr. Cambray used the rear bedroom in Apartment 29G at the Worthing at Galleria Apartments in Smyrna, Georgia for this purpose. Apartment 29G has one means of ingress and egress through the door to the hallway. There is a balcony on the left side of the living room. Access to the balcony can be made through sliding glass doors. There is an exit directly from the balcony to the street level which is two levels below.

---

[1]Mr. Miranda and his co-defendants rested without presenting any testimony.

Antonio Mojica Ramon ("Mr. Mojica") was employed by Mr. Cuevas to serve as a courier of drugs and to collect the proceeds from their sale. On two occasions prior to September 5, 2002, Mr. Mojica delivered drugs to Apartment 29G. On the first occasion, Mr. Mojica delivered two kilograms of cocaine to Mr. Cambray at Mr. Cuevas's request. Mr. Mojica directed Mr. Cambray to add a non-narcotic substance to the pure cocaine to increase the weight to four kilograms. When Mr. Mojica delivered cocaine to Apartment 29G, Defendant Adan Gil Miranda was sitting on the couch in the living room watching television. When Mr. Mojica returned to Apartment 29G the following day after receiving a telephone call that the cocaine had been cut, Mr. Mojica again saw Mr. Miranda sitting on a couch watching television.

Through intercepted telephone calls between members of the Cuevas organization, officers of the DEA Task Force learned that a residence at 499 Alcott Street in Smyrna, Georgia was being used as a stash house. The DEA task force obtained a warrant to search that residence. In what is referred to as a "sneak-and-peek" investigative operation, members of the DEA Task Force entered into the 499 Alcott Street residence at 4:45 a.m. on August 22, 2002, when no one was there and removed three pounds of methamphetamine. They did not leave a copy of the search warrant because they wanted to make it appear that a

4

burglary had been committed. By staging a burglary, the agents hoped to precipitate activity within the Cuevas conspiracy that would provide additional evidence of criminal conduct.

The ruse had the desired effect. Mr. Cuevas discussed the apparent theft of the methamphetamine from the 499 Alcott Street stash house with Jesus Alvear Uribe. The methamphetamine had a street value of $24,000 to $30,000. Mr. Uribe suggested that Mr. Mojica was the thief. Mr. Cuevas suspected that the culprit was a man who had been employed to wash the methamphetamine at the 499 Alcott Street stash house. After the entry into the 499 Alcott Street stash house and the apparent theft of methamphetamine, Mr. Cuevas moved his methamphetamine and cocaine operation to Apartment 29G.

On September 4, 2002, Mr. Cuevas asked Mr. Cambray to deliver a pound of methamphetamine to David Herrera and Jose Cisneros. Mr. Cambray delivered the methamphetamine to Mr. Herrera and Mr. Cisneros at a parking lot next to the La Barca Restaurant. The distribution of the drug was observed by DEA Task Force officers.

Some of the DEA Task Force followed Mr. Herrera and Mr. Cisneros as they drove away from the La Barca Restaurant. The officers requested that Cobb County Police Department officers make a traffic stop of the vehicle. When the car

5

was stopped and searched, a Cobb County K-9 unit discovered a brick of methamphetamine.

Other members of the DEA Task Force followed Mr. Cambray in order to locate the new drug processing site. They followed Mr. Cambray to the Worthing at Galleria Apartments. Later, the officers observed Mr. Cambray deliver a plastic bag to Mr. Mojica outside the Worthing at Galleria Apartments. The following day, the DEA Task Force obtained a search warrant to search Apartment 29G.

At 8:00 p.m. on September 5, 2002, members of the DEA task force went to Apartment 29G to execute a search warrant. The officers assumed that the occupants of Apartment 29G would be armed. The task force members were wearing gray gear that had the initials "DEA" on the front. After an officer knocked on the door, and it was opened a little, the officers yelled "police" and pushed the door open and entered. DEA Special Agent Keith Cromer entered the room first, carrying a bullet resistant ballistic shield. He observed Mr. Miranda and another man sitting on a couch that was parallel to one wall facing a television set placed in front of the opposite wall. A female had opened the door. Special Agent Cromer also observed Jose Calderon Salgado standing next to the kitchen.

The only escape route from Apartment 29G was through the hallway door which was blocked by eleven DEA agents. As Special Agent Cromer approached

6

Mr. Salgado, Mr. Miranda ran past the officer and entered a hallway that led to the back bedroom. Special Agent Cromer shouted: "Stop running down the hallway, stop police." Mr. Miranda did not stop. Instead, he entered the back bedroom and attempted to close the door. Special Agent Cromer stuck his foot in the door and pressed his ballistic shield against it. Special Agent Cromer pushed the door open and saw two guns lying in plain view on a mattress. Special Agent Cromer yelled "gun," at which time Mr. Miranda let go of the door.

Mr. Miranda ran into a bathroom. Special Agent Cromer ordered Mr. Miranda to come out of the bathroom. After a few minutes, Mr. Miranda came out of the bathroom. He was placed under arrest and removed to the living room.

There were two mattresses on the floor in the back bedroom. The two handguns Special Agent Cromer had observed when Mr. Miranda attempted to close the door were lying on top of one of the mattresses. In the middle of the room was a kilo press on a stand. A kilo press is used by narcotics traffickers to compress a kilogram quantity of a controlled substance.

On a folding table was a microwave and the top part of a blender. The control portion of the blender was lying on floor. In the blender top was a quantity of what appeared to be methamphetamine. The substance was wet.

Special Agent Cromer also found a damp substance in the kilo press which

appeared to be methamphetamine. Special Agent Cromer testified that based on his training and experience, he believed that methamphetamine had been mixed with another substance in the blender, and then compressed in the kilo press.

The back bedroom also contained cans of acetone and manitol. Acetone is used to purify methamphetamine. Manitol is a cutting agent used to dilute cocaine to increase its value. In preparing cocaine for distribution, it is placed in a blender and then heated to soften it. Manitol is then added to the cocaine and the two substances are blended together, compressed, and then packaged for distribution.

Special Agent Cromer also found a small digital scale on the floor in the back bedroom. He also discovered several clear plastic bags. Plastic bags are used by drug dealers to package small quantities of drugs for distribution.

In one of the closets in the bedroom, Special Agent Cromer discovered a package of food savers. Food savers are ordinarily used to seal food that is to be stored in a freezer for a long period of time to preserved its freshness. Narcotics traffickers use food savers to seal drugs in an attempt to prevent the odor of the drug from being detected.

In the other closet in the back bedroom, Special Agent Cromer found a black duffel bag which contained a large quantity of what appeared to be kilo bricks of methamphetamine wrapped in pink plastic, and a large bottle of super

manitol. In addition, he located a white bucket that contained what appeared to be methamphetamine.

When Special Agent Cromer entered Apartment 29G, it reeked of acetone. Before leaving, the officers opened the sliding glass doors, the door to the hallway, and the rear bedroom windows to dissipate the odor.

B

After the prosecution presented its case in chief, each defendant moved for a judgment of acquittal pursuant to Rule 29. Counsel for Mr. Miranda argued that the prosecution's evidence was insufficient because it only demonstrated mere presence, and not the elements of knowledge and intent required to prove a conspiracy. The District Court informed the defendants that it would reserve its ruling on the motions until after the jury returned its verdict. Thereafter, each defendant rested without presenting any evidence.

The District Court instructed the jury as follows regarding the "mere presence" defense.

> A person may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names or identities of all the other alleged conspirators. So, if a defendant has a general understanding of the unlawful purpose of the plan, including the nature and anticipated weight of the substance involved, and knowingly and willfully joins in

9

that plan on one occasion, that is sufficient to convict that defendant of conspiracy even though the defendant did not participate before, and even though the defendant played only a minor part.

Of course, mere presence at the scene of a transaction or event does not establish proof of a conspiracy. Neither, necessarily does the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator.

The jury found Mr. Miranda guilty as charged on May 28, 2004. On August 4, 2004, Mr. Miranda filed a written motion for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.[2] On October 20, 2004, the District Court entered an order granting Mr. Miranda's motion for a judgment of acquittal. The Government filed a timely notice of appeal. This court has jurisdiction pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

## II

The Government contends that the District Court ignored relevant direct and circumstantial evidence, and failed to view the evidence in the light most

---

[2]Rule 29(c) provides as follows:
A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

favorable to the prosecution in ruling that Mr. Miranda was not a member of the alleged conspiracy. In considering a motion for the entry of a judgment of acquittal, a district court

> must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. The prosecution need not rebut all reasonable hypotheses other than guilt. The jury is free to choose between or among the conclusions to be drawn from the evidence presented at trial, and the district court must accept all reasonable inferences and credibility determinations made by the jury. The District Court's determination that the evidence introduced at trial was insufficient to support the jury's verdict of guilt is issue of law entitled to no deference on appeal.

*United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989) (internal citations omitted).

"To prove participation in a conspiracy, the government must have proven beyond a reasonable doubt, even if only by circumstantial evidence, that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005) (citation omitted). "To satisfy this burden, the government need not prove that the defendant[] knew all of the detail[s] or participated in every aspect of the conspiracy. Rather, the government must only prove that the defendant[] knew the

essential nature of the conspiracy." *Id.* at 1269-70 (quotations and citation omitted). "Whether [the defendant] knowingly volunteered to join the conspiracy may be proven by direct or circumstantial evidence, including inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Id.* (quotations and citation omitted).

"Although mere presence at the scene of a crime is insufficient to support a conspiracy conviction, presence nonetheless is a probative factor which the jury may consider in determining whether a defendant was a knowing and intentional participant in a criminal scheme." *McDowell*, 250 F.3d at 1365. For example, this Court held in *United States v. Cruz-Valdez*, 773 F.2d 1541 (11th Cir. 1985), that where large quantities of drugs are present "a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders." *Id.* at 1547. Under such circumstances, there is a "need for strong arm men or guards to safeguard transactions." *Id.*

To convict a defendant of possession with intent to distribute controlled substances, the Government must prove that he or she possessed drugs with the intent to distribute them. *United States v. Harris*, 20 F.3d 445, 453 (11th Cir. 1994). "The government may prove each of these elements with direct or circumstantial evidence." *Id.*

To sustain Mr. Miranda's conviction under 18 U.S.C. § 924(c), the Government was required to prove that, during and in relation to the conspiracy to distribute cocaine and methamphetamine, Mr. Miranda "used, carried, or possessed a firearm in furtherance of that conspiracy." *United States v. Gunn*, 369 F.3d 1229, 1234 (11th Cir. 2004). "Possession may be actual or constructive, joint or sole." *Id.*

In granting Mr. Miranda's motion for a judgment of acquittal, the District Court stated that "the court does not believe that this case against Miranda involves more than mere presence." The District Court explained that to support a conspiracy conviction, the Government was required "to put forth some additional evidence beyond Mr. Miranda's habitation of 29G and flight within 29G to support a connection of conspiracy and possession of the drugs and firearms, and the Government did not put forth any such evidence." The District Court appears to have construed Mr. Miranda's conduct in running to the back bedroom as flight to escape arrest.[3] That is one possible inference that a reasonable jury could draw from Mr. Miranda's actions. The jury was also free to infer from the totality of the circumstances that Mr. Miranda's role in the conspiracy was to guard the large

---

[3]Flight is defined as "[t]he act or instance of fleeing, esp. to evade arrest or prosecution." BLACK'S LAW DICTIONARY 670 (8th ed. 2004).

13

quantity of drugs stored in the back bedroom, and that his motive in running to that room, which had no outside exit, was to attempt to arm himself and to conceal or destroy the drugs.

The District Court cited this Court's decision in *United States v. Pantoja-Soto*, 739 F.2d 1520, 1527 (11th Cir. 1984), for the principle that "flight combined with mere presence is insufficient to prove participation in a conspiracy." A comparison of the evidence presented in *Pantoja-Soto* with the facts heard by the jury in this matter will demonstrate that the District Court erred in granting a judgment of acquittal.

In *Pantoja-Soto*, a DEA confidential informant made a controlled buy of methaqualone at a gas station in the "Little Havana" section of Miami at 9:30 p.m. on April 6, 1981. Shortly thereafter, the confidential informant handed a DEA agent methaqualone tablets that he had purchased at the gas station. At 9:55 p.m. on the same date, fourteen DEA agents and local police officers entered the gas station area with weapons drawn. The officers arrested Fulgencio Pantoja-Soto and Manuel Roberto Guerrero, who were kneeling together outside the gas station next to an automobile with the hood up. *Id.* at 1522.

When the officers arrived, Raul Pal-Sali and Niko A. Nunez were standing in the gas station office. When one of the DEA agents approached the office, Mr.

14

Pal-Sali ran out the front door and was arrested. Mr. Nunez ran out a side door into the service bay area. After a ten-minute search, Mr. Nunez was found hiding behind a rack of tires in a storeroom. During the search for Mr. Nunez, the officers found four large boxes on the floor of one of the service bays. Two of the boxes were open with methaqualone tablets plainly visible inside. *Id.* at 1523.

Mr. Guerrero, Mr. Pal-Sali, and Mr. Nunez were found guilty of conspiracy to possess, with intent to distribute, methaqualone, and knowingly and intentionally possessing, with intent to distribute, a quantity of methaqualone. The trial court denied their motions for a judgment of acquittal. *Id.* at 1523.

In analyzing the evidence, the majority in *Pantoja-Soto* noted the following factors that may be considered in determining whether the evidence is sufficient to support a conspiracy conviction. *Id.* at 1525. First, "evidence of a pre-existing relationship among the accused . . .." *Id.* The majority held that this factor was "notably absent in the instant case." *Id.* at 1526. Second, "[w]hile knowledge that a criminal undertaking was occurring would not be sufficient to sustain the convictions, such evidence would be probative." *Id.* The majority held that "that evidence is not to be found in this case." *Id.* Third, "presence at the scene of the crime and flight, without more, are insufficient to prove commission of a crime." *Id.* The majority also noted in *Pantoja-Soto* that "[n]o one testified as to any

15

telltale odors, noises, or sights at the station from which a jury could have inferred that appellants knew of the drug's presence." *Id.* at 1527.

The evidence presented by the Government in this case is readily distinguishable from the circumstances in *Pantoja-Soto*. In this matter, it is undisputed that Mr. Miranda had a pre-existing relationship with Mr. Cambray, a significant figure in the Cuevas drug conspiracy. Mr. Miranda was the co-occupant of 29G, the Cuevas operation's drug stash house. Also, unlike the circumstances in *Pantoja-Soto*, the District Court acknowledged that "[t]he jury likewise could have reasonably concluded that Mr. Miranda *knew* about the drug activity occurring in Apartment 29G." (emphasis in the original). The District Court also found that Mr. Miranda was present in Apartment 29G, "when Mr. Mojica couriered drugs to (and possibly discussed drugs with) other individuals."

The Government presented evidence at trial that there was a pervasive smell of acetone in the apartment. A reasonable jury could infer from this evidence that Mr. Miranda was aware of the drug activities in the apartment. Thus, in contrast to the Government's case against Mr. Nunez in *Pantoja-Soto*, there was ample evidence that Mr. Miranda was aware that criminal activity was occurring in Apartment 29G. No evidence was presented to the jury in *Pantoja-Soto* that would support an inference that Mr. Nunez's job was to guard the methaqualone tablets,

16

or that his motive in running from the office to hide in a rear storeroom was to attempt to arm himself or to prevent the officers from seizing the drugs.

Here, when the officers raided the apartment, Mr. Miranda immediately ran to the back bedroom where a large quantity of drugs was stored and two guns were readily accessible. Mr. Miranda attempted to shut the door to prevent agents from entering the room. He was prevented from shutting the door only because Agent Cromer forced his way into the room. Given the evidence of Mr. Miranda's awareness of the drug activities at the apartment, a reasonable jury could find that Mr. Miranda attempted to protect the drugs from being seized by the agents, either by destroying the drugs, or by forcibly resisting the officers with the firearms.

The District Court noted that "when Cambray entered his guilty plea to this court, he stated that 'everything in the apartment, all of that is my responsibility.'" Mr. Cambray did not testify at Mr. Miranda's trial. The District Court erred in considering facts that were not presented to the jury in ruling on Mr. Miranda's motion for a judgment of acquittal. The District Court made the same error when it noted that the Government had offered Mr. Miranda a plea bargain in which Mr. Miranda would plead guilty to misprision of felony, which carries a maximum sentence of three years. No evidence of such an offer was presented to the jury.

In combination with the evidence of Mr. Miranda's knowledge of the drug

dealing at the apartment, his presence during drug transactions, his relationship with Mr. Cambray, and his conduct in attempting to prevent the officers from entering the room where the drugs were processed and stored, a rational jury could find from this conduct that Mr. Miranda knowingly and voluntarily joined the Cuevas conspiracy. The Government's proof met the factors set forth in *Pantoja-Soto* for a determination of whether a reasonable trier of fact could find that Mr. Miranda knowingly and voluntarily participated in the Cuevas conspiracy. Moreover, due to the presence of large quantities of cocaine and methamphetamine, the evidence presented that demonstrated the existence of a conspiracy, and Mr. Miranda's participation in it, was also sufficient to support his convictions for possessing cocaine and methamphetamine. *See United States v. Lynch*, 934 F.2d 1226, 1231 (11th Cir. 1991) ("Because the presence of cocaine was uncontested, the evidence establishing [the defendant's] participation in the conspiracy also sufficed to prove his possession of the cocaine with intent to distribute.").

The evidence was also sufficient to support Mr. Miranda's conviction for possession of a firearm in furtherance of a drug trafficking crime. When agents entered the apartment, Mr. Miranda ran to the back bedroom and attempted to close the door. From this evidence, a reasonable jury could infer that Mr. Miranda

18

had the power and intention to exercise dominion and control over the firearms. *See Gunn*, 369 F.3d at 1235 (noting that "[a] defendant also has constructive possession if he has the power and intention to exercise dominion or control"). A reasonable jury could also infer that the purpose of firearms, lying in plain view on a mattress next to substantial quantities of drugs, was "to provide defense or deterrence in furtherance of the drug trafficking for which defendant was arrested." *United States v. Mackey*, 265 F.3d 457, 462-63 (6th Cir. 2001); *see also United States v. Timmons*, 283 F.3d 1246, 1252 (11th Cir. 2003) (noting that "the nexus between the gun and the drug operation can be established by the type of the drug activity that is being conducted, accessibility of the firearm, the type of weapon . . . proximity of the gun to the drugs or drug profits, and the time and circumstances under which the gun is found"). Accordingly, we conclude that the evidence presented at trial was sufficient to support Mr. Miranda's convictions. The District Court erred in granting his motion for a judgment of acquittal.

### III

In his brief to this Court, Mr. Miranda asks us to affirm the District Court's grant of a judgment of acquittal on the grounds that the prosecutor engaged in misconduct in arguing to the jury that narcotics traffickers "don't allow people in a stash house unless they're involved." Mr. Miranda also contends that the

19

prosecution violated the District Court's in limine order that Special Agent Cromer should be instructed not to testify that in his expert opinion drug traffickers do not tolerate anyone being present in a stash house who is not involved in the conspiracy. During cross-examination by a co-defendant's attorney, Special Agent Cromer testified that "only people closely associated with stash houses are going to be allowed to be in there, especially a processing center with a large quantity of drugs . . . ." Mr. Miranda argues that the prosecutor's alleged misconduct is an alternative basis for affirming the judgment of acquittal.

We disagree. Rule 29 provides that a "court on motion of a defendant or of its own motion <u>shall</u> order the entry of a judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is *insufficient to sustain a conviction* of such offense or offenses." (emphasis added). "The sole ground for a post-trial motion under Rule 29(c) is that the evidence was insufficient to sustain a conviction." *United States v. Fozo*, 904 F.2d 1166, 1171 (7th Cir. 1990). *See United States v. Ellison*, 684 F.2d 664, 665 (10th Cir. 1982), *vacated on other grounds*, 722 F.2d 595 (10th Cir. 1982) (holding that prosecutorial misconduct is not a ground for action under Rule 29(c)).

In his post-trial August 4, 2002 motion, Mr. Miranda asked for a new trial

as an alternative to the entry of a judgment of acquittal as a remedy for the alleged prosecutorial misconduct discussed above. The District Court's October 20, 2004 order granting Mr. Miranda's motion for a judgment of acquittal makes no reference to his alternative request that he be granted a new trial. Rule 29(d)(1) of the Federal Rules of Criminal Procedure provides that "[i]f a court enters a judgment of acquittal after a guilty verdict, the court <u>must</u> also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination." (emphasis added). Rule 29(d)(3)(A) provides further that "[i]f the court conditionally grants a motion for a new trial and an appellate court later reverses the judgment of acquittal, the trial court must proceed with the new trial unless the appellate court orders otherwise."

In this matter, the District Court failed to determine conditionally whether it should grant Mr. Miranda's motion for a new trial, as mandated by Rule 29(d)(1). Mr. Miranda did not file a protective cross-appeal requesting that this Court remand this matter with instructions to rule on his motion for a new trial.

In *United States v. Lachman*, 387 F.3d 42 (1st Cir. 2004), the district court also failed to comply with Rule 29(d)(1) when it granted a motion for a judgment of acquittal. *Id.* at 60-61. In their cross-appeal, the defendants argued that the First

21

Circuit should remand the case to the district court with directions that it rule on their motion for a new trial. *Id.* at 59. The *Lachman* court agreed, vacated the judgment of acquittal, reinstated the defendant's convictions, and remanded for a ruling on the defendants' motion for a new trial. *Id.* at 60.

Because Mr. Miranda failed to file a cross-appeal in this matter, the question whether we should remand this matter to the District Court because it failed to rule on his motion for a new trial, as compelled by Rule 29(d)(1), is not properly before us. We express no view regarding the merits of Mr. Miranda's contention that he was denied due process because of prosecutorial misconduct.

For the guidance of the District Court and the parties, however, we address, *sua sponte*, the question whether upon remand, the District Court must proceed to impose sentence or whether it has the jurisdiction to rule upon the merits of Mr. Miranda's conditional motion for a new trial. In *United States v. Ward*, 274 F.3d 1320 (11th Cir. 2001), this Court held that when a district court grants a motion for a judgment of acquittal, without complying with the mandatory provisions of Rule 29(d)(1), it has the authority, upon remand, after a reversal of a judgment of acquittal, to consider whether it should grant or deny a motion for a new trial. *Id.* at 1323. We express no view as to the proper determination of that motion.

## CONCLUSION

22

We VACATE the judgment of acquittal because we are persuaded that the evidence presented by the Government was sufficient to demonstrate to a reasonable jury beyond a reasonable doubt that Mr. Miranda knowingly and voluntarily participated in the Cuevas conspiracy as a guard of the controlled substances stored in Apartment 29G, and that he constructively possessed the drugs and firearms found in the back bedroom. We REMAND this action for further proceedings consistent with this opinion.

**VACATED and REMANDED.**