[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14732
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 16, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00039-CR-1-SPM-AK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRYAN ACOSTA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(April 16, 2009)

Before CARNES, WILSON and FAY, Circuit Judges.

PER CURIAM:

Bryan Acosta appeals his convictions and sentences for conspiracy to possess with intent to distribute more than 100 marijuana plants and possession with intent to distribute more than 100 marijuana plants, in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(B)(viii).  On appeal, he argues that: 1) there was insufficient evidence to support his convictions; 2) the district court should have granted him a mistrial because it did not instruct the jury on the definition of a "marijuana plant;" 3) the district court should have granted him a mistrial based on comments made by the prosecutor during closing argument; and 4) the district court erred by denying his request for a safety-valve reduction.  For the reasons set forth below, we affirm.

## I.

At trial, the government called Wayne Andrews, Special Agent with the Drug Enforcement Administration ("DEA"), who testified that on November 13, 2007,  he received information from an Agent Rosales that there was a potential indoor, marijuana grow site operating in a house in Alachua County, Florida. Andrews and other officers, wearing street apparel and driving unmarked vehicles, went to the house to attempt to conduct a "knock and talk."  During the initial drive-by, they observed that all of the windows of the house were boarded up. Rosales, a bilingual agent, made contact with an individual, later identified as

2

Acosta, at the front of the residence, identified himself as a law enforcement officer, and asked the individual to come to the fence and speak with the officers. Acosta told them to wait and then ran back inside the house.

At that point, Andrews climbed over the fence and Acosta came back out of the house and told the officers to wait at the fence. Acosta went back inside the house, at which point Andrews and the other officers overheard what they believed to be Acosta "barricading the front door of the residence." Andrews testified that, because the officers could smell "raw flowering marijuana" from the street, they attempted to enter the front door and secure the residence. However, they could not enter the front door because it "had obviously more security on it than a normal door . . . ." Acosta became "very irate, yelling and screaming," and, because the officers were not sure whether Acosta was going to start shooting through the front door, they backed off. In doing so, they heard noises from various rooms in the house and observed cameras set up on the exterior of the house. The officers tried to disable the cameras, at which point Andrews heard Acosta yelling at another officer to stop "messing with the camera" and instructing him to show his badge. To ensure that the officers had adequately identified themselves, Andrews went back to his vehicle, turned on the lights and sirens, and identified the officers through a PA system for approximately 20 or 30 minutes.

3

Andrews clarified that Acosta began barricading the front door within five minutes of the officers' arrival at the residence, but it was approximately four to four and a half hours before the officers actually entered the house. During those four hours, preparations were made to enter the house and the Alachua County Sheriff's Office ("ACSO") arrived with marked vehicles, a helicopter, and a marked armored vehicle. In addition, Agent Rosales – using the PA and speaking in both English and Spanish – repeatedly asked the people inside the house to come out every five to ten minutes. Andrews estimated that Rosales made 60 to 70 such announcements in both English and Spanish, and Andrews made 15 to 20 announcements himself. Ultimately, a federal judge issued a search warrant and, after a SWAT vehicle pulled up in front of the house, the individuals exited the house. The two men that exited – Acosta, who was in his early 20's, and Rolando Maestrey, an older Hispanic male who was approximately 80 years old – were wearing jeans and t-shirts, which were dirty and smelled like marijuana.

Upon entering the house, Andrews observed "a sophisticated indoor grow operation where everything was intact except for the plants. The plants had been pulled out of the pots or containers that they were in and then concealed throughout the house." Other plants had been cut up with gardening shears and placed in trash bags, which were concealed in the attic and garage. With respect to

4

the number of total plants found, Andrews testified:

> I believe there was a total of 151 plants that were recovered from this residence. Seventy-one, I believe, of the plants still had the root base, the stalk and the leaves attached. There may be 80 or so marijuana plants that had been cut off at the base and chopped up into as many pieces as they could and stuck in the trash bags.
>
> . . .
>
> Now some of these that I say were cut off, they may have been cut off but they weren't cut off right at the ground. They still would be technically considered a plant . . . because they still had the root balls, a stalk and some leaves coming out of them. That still is what's deemed as a plant. But of these ones I'm talking about, they had fresh sap still running down alongside of them, both in the root base and in the stalk itself that was shoved into the trash bags.

Andrews also found "a substantial amount of paraphernalia" in the house and, with the exception of one bedroom, the living room, and the dining room – all of which had "grow implements or security implements" – the entire house was "set up solely as a grow house." Andrews observed a monitor system set up in the bedroom "where they could look at the cameras and view outside what was going on," and the doors and windows were secured with "lag bolts" and "thick plywood sheeting behind them." Andrews also discovered a cellular telephone in the house that was registered in Acosta's mother's and father's name.

Andrews repeated that there were 71 full marijuana plants with root base, stalk, and leaves intact, and there were 80 plants with identifiable root bases, thus

5

totaling 151 plants. The root balls were "very fresh" and had sap running down the sides, indicating that their stalks had been recently cut. In a truck parked in front of the house, Andrews found $7,000 in cash, $166 in Acosta's wallet, Acosta's driver's license, and "tally sheets" that "showed money owed . . . ." There was also a letter addressed to Acosta that read: "$300 an ounce, one rolo, one caned, one quarter cane," which, according to Andrews, represented "common prices [and language] that [they] typically see" in narcotics investigations.

On cross-examination, Andrews testified that the house was not owned by Acosta, but was rather registered under the name Marta Matos, and it was later brought to Andrews's attention that a man named Julio Cesar Rodriguez-Matos had been setting up grow houses "all over." The officers discovered the cell phone registered in Acosta's parents' names, which was fully charged and operational, on top of a shelf against the kitchen ceiling. On re-direct examination, Andrews testified that he did not see any signs of new construction on the outside of the house.

The government called several other law enforcement officers, who testified consistently with Andrews. For example, the government called Florentino Rosales, Special Agent with the DEA, who testified, inter alia, that during the initial encounters with Acosta, he identified himself and the other officers as

federal agents in English and Spanish. The government called Daniel Wolfe, an officer with the Bradford County Sheriff's Office assigned to the DEA, who testified, <u>inter alia</u>, that he filmed the entire interior and exterior of the house and did not see "any signs of new construction" or any "concrete slabs" outside of the house. Wolfe also confirmed that they discovered 71 live marijuana plants and 84 (not 80) root balls, the latter of which had oozing stalks coming out of them. The government also called Daryl Bessinger, a sergeant with ACSO, who testified, <u>inter alia</u>, that they moved the PA close to the house so that the people inside could hear it, and Rosales "made many, many announcements both in Spanish and in English, that we were the sheriff's office and the DEA . . . ."

The government then called Maestrey, who testified, through an interpreter, as follows. He was born in Cuba, spoke no English, and was 80 years old. Because he was out of work, a man named Julio asked him to "come and cook at a farm," and Julio brought Maestrey to the house in Alachua. Julio subsequently brought Acosta to the house, where Acosta stayed for two days. Maestrey initially testified that he did not know whether Acosta watered the marijuana plants but, when asked if Acosta was taking care of the plants, Maestrey responded, "Very probably." Maestrey then testified that Julio and Acosta brought hoses into the house and that Acosta went into all of the rooms in the house. On the day of the

7

incident, Acosta came running into the house and, although he initially told Maestrey that there were robbers outside, he eventually told Maestrey that the people outside were the police. After Acosta spoke to someone on the phone in English, he then pressured Maestrey to tear down all of the marijuana plants. Although Maestrey pulled some of the plants out of the pots, Acosta was the one who cut, burn, and hid the plants.

After the government rested its case, and the court denied defense counsel's motion for a judgment of acquittal, defense counsel called Acosta, who testified on his own behalf as follows. He was living in Ft. Myers, but was hired by one of his neighbors, a man named Roberto, to do a construction job at the house in Alachua. Specifically, on November 9, the week before his arrest, he went to the house, at which time a man named Julio, the owner of the house whom he had never met before, instructed him to install a concrete slab that would act as an extension of the pigpen on the property. Acosta was unaware that there was marijuana being grown inside the house at the time because he did not enter the house. After Acosta returned home to Ft. Myers, Roberto informed him that the owners of the house would pay Acosta extra if he were to return to the house with groceries for Maestrey, which Acosta did the following Tuesday, November 13. At that point, Maestrey gave Acosta a pound and three quarters of processed marijuana as

payment. Acosta explained that the $7,000 found in his truck was money that he had saved up to buy a synthesizer so that he could start a music career.

On the day that he was arrested, Acosta testified that he was getting ready to put the processed marijuana in his car when he saw Agent Rosales screaming at him. Acosta did not know who Rosales was, and he went back inside the house and told Maestrey what was going on. The men started kicking the door, and although the men had identified themselves as law enforcement officers, Acosta believed that the men were robbers because he had not seen their credentials. While Acosta and Maestrey were in the house, Maestrey gave Acosta's cell phone number to Julio, and Julio called Acosta and told him that he needed him to "tear up" the marijuana. Maestrey asked Acosta to help him hide the evidence and, although Acosta did not burn any of the marijuana, he "pulled out the plants" because he was nervous. Acosta could not hear what the men outside were saying over the PA, but finally realized that they were the police when he heard the helicopter.

On cross-examination, Acosta testified that, after he arrived at the house and received instructions on installing the concrete slab, he went and purchased approximately 20 bags of concrete. He testified that he accepted the marijuana as payment from Maestrey so that he could smoke it and because it was a "great

9

deal." When he returned to the house the second time with groceries for Maestrey and entered the house, he "saw a whole bunch of different stuff around, different equipment" and smelled "something strange." After Maestrey offered to pay him in marijuana, Acosta realized for the first time that the house was a grow house.

Acosta testified that he took the jobs because he was struggling financially and had debts piling up after the housing market crashed, yet he decided to spend all of his savings on a synthesizer because he thought he was going to be a successful music producer. The prosecutor then suggested that the $7,000 was instead intended to purchase marijuana, to which Acosta responded: "Well, I don't think you quite understand. When you are buying quantities, he is not going to sell you at $400 an ounce. That's bulk. You don't sell at the same price."

After the defense rested, the government recalled several law enforcement officers, all of whom testified that they did not see any concrete slab next to the pigpen. Defense counsel responded by calling Mario Acosta, Acosta's father, who testified that he went to the house in Alachua with defense counsel the previous evening and took pictures of the concrete slab.

During closing arguments, the prosecutor made the following comments. He stated that Maestrey "saw Bryan Acosta bring in hoses for watering the plants, that he participated with Julio and some other unknown person in setting up this

grow operation." In addition, the prosecutor remarked: "In fact, the testimony of Mr. Acosta is just his testimony. We have no receipts that were found in the truck for concrete. You never saw receipts." After defense counsel gave his closing argument, the prosecutor, in his rebuttal argument, reiterated: "Again, that's what Mr. Maestry said, [Acosta] was bringing the hoses, small hoses to water the plants. Did he water the plants? Yes. That's what Mr. Maestrey said." The prosecutor then asked the jury whether Maestrey struck them "as someone who was telling the truth about what was going on?" Finally, and after referring to the tally sheets found in Acosta's car, the prosecutor stated: "Despite what [defense counsel] says, the facts are that those things existed . . . ."

The court then instructed the jury that the government had the burden to prove that the defendant was guilty beyond a reasonable doubt and that the defendant was not required to produce any evidence at all. It also instructed the jurors to consider only the evidence admitted, which did not include statements by the lawyers. In addition, the court instructed the jury to determine the credibility of the witnesses by, inter alia, asking whether the witness appeared truthful. The court did not instruct the jury on the definition of a "marijuana plant." The jury thereafter returned a guilty verdict against Acosta on both counts.

The probation officer then prepared a pre-sentence investigation report

11

("PSI").  The probation officer determined that Acosta had a total offense level of 18 and a criminal history category of I, giving him an applicable guideline range of 27 to 33 months' imprisonment.  However, the probation officer determined that he was subject to the mandatory statutory minimum sentence of 60 months' imprisonment under 21 U.S.C. § 841(b)(1)(B), which became his guideline sentence under U.S.S.G. § 5G1.1(b).

Acosta objected to the PSI, arguing, <u>inter alia</u>, that he was eligible for safety-valve relief under U.S.S.G. § 5C1.2 and, thus, was not subject to the statutory minimum.  The probation officer responded that Acosta did not qualify for safety-valve relief "because he has not yet truthfully provided to the government all information and evidence that he has concerning the offense."

Before sentencing, Acosta filed several post-trial motions.  He filed a motion for a mistrial, arguing that he was denied a fair trial because the jury was not instructed on the definition of a "marijuana plant."  He filed a motion for judgment of acquittal, arguing that the evidence was insufficient to sustain his convictions and, in the alternative, that the evidence only supported convictions for offenses involving less than 100 marijuana plants.  In addition, Acosta filed a second motion for a mistrial based on the above statements made by the prosecutor during closing argument.

At the sentencing hearing, the court denied all of the above motions. Defense counsel then argued that Acosta was entitled to a safety-valve reduction and informed the court that Acosta had provided a written statement disclosing all of the information he knew about the offenses. After the court took a recess and read Acosta's written statement, the court denied the request for safety-valve relief because it was "not convinced by a preponderance of the evidence that the defendant has truthfully provided all information and evidence that he has regarding this offense. Therefore, the court finds that the defendant has not adequately shown that he satisfies the requirements of the safety valve." The court sentenced Acosta to 60 months' imprisonment on both counts, to run concurrently. This appeal followed.

## II.

### A.    Sufficiency of the Evidence

"We review challenges to the sufficiency of the evidence de novo." United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008), cert. denied, 129 S.Ct. 954 (2009). We ask "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. In doing so, we view the evidence in the light most favorable to the government and all reasonable inferences and credibility choices are made in the government's favor." Id. (citation omitted). "[W]e will not disturb

13

a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005) (quotations omitted).

To obtain a conviction for conspiracy to distribute marijuana, "the government must have proven beyond a reasonable doubt, even if only by circumstantial evidence, that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy." United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005). "Although mere presence at the scene of a crime is insufficient to support a conspiracy conviction, presence nonetheless is a probative factor which the jury may consider in determining whether a defendant was a knowing and intentional participant in a criminal scheme." Id. (quotation omitted). Indeed, a "conspiracy conviction will be upheld when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." United States v. Garcia, 447 F.3d 1327, 1338 (11th Cir. 2006) (quotation and alteration omitted).

"To convict a defendant of possession with intent to distribute controlled substances, the Government must prove that he or she possessed drugs with the intent to distribute them." Miranda, 425 F.3d at 959. "The government may prove

14

each of these elements with direct or circumstantial evidence." Id. (quotation omitted). Where the presence of a large quantity of narcotics is clear and uncontested, the proof required to establish the existence of a conspiracy and the defendant's participation therein is also sufficient to prove possession of the narcotics. United States v. Cruz-Valdez, 773 F.2d 1541, 1544 (11th Cir. 1985).

In this case, Acosta does not dispute that there was a conspiracy to distribute marijuana, but rather contends that he did not join that conspiracy because he was "merely present" at the residence. However, the evidence was sufficient for the jury to conclude that Acosta did participate in the conspiracy. The most incriminating fact is that Acosta admittedly pulled the marijuana plants out of the pots in an attempt to hide them from law enforcement. See United States v. Newbern, 731 F.2d 744, 751 (11th Cir. 1984) ("The attempt to destroy evidence . . . strengthens the conclusion that [the defendants] were active members of the conspiracy."). Furthermore, and drawing credibility determinations in the government's favor, the jury was entitled to believe Maestrey's testimony that Acosta was also the one to cut, burn, and hide the plants. Maestrey also testified that Acosta went into all of the rooms of the house, brought hoses into the house with Julio, and "[v]ery probably" cared for the plants.

Circumstantial evidence also supported the inference that Acosta

participated in the conspiracy. Law enforcement officers found marijuana tally sheets in Acosta's truck. Also found in Acosta's truck was $7,000 in cash and, although Acosta testified that he planned on using this money to purchase a synthesizer, the jury was free to disbelieve this testimony, as Acosta testified that he was nearly broke at the time. Acosta also admittedly accepted marijuana as payment and testified about purchasing marijuana in bulk, casting doubt on his testimony that he was not involved in the greater conspiracy. See Miranda, 425 F.3d at 961 (concluding that the defendant participated in a drug conspiracy based in part on his knowledge of drug dealing). Finally, the officers discovered Acosta's cell phone hidden on top of a cabinet in the kitchen, supporting the inference that Acosta had been in contact with members of the conspiracy either before or during the standoff.

Acosta's defense at trial was that he was called to the house first to install a concrete extension to the pigpen of the house and then to bring Maestrey groceries. With respect to his first visit, and although none of the law enforcement officers saw a concrete slab, even if Acosta did install such a concrete slab, the jury was free to disbelieve Acosta's testimony, as it is unlikely that the owner of the grow house would have risked the security of his extensive marijuana operation so that a stranger could install an extension to a pigpen. See Cruz-Valdez, 773 F.2d at 1547

16

("[A] prudent smuggler is not likely to suffer the presence of unaffiliated bystanders."). This is especially true where the law enforcement officers testified that the odor of marijuana surrounding the house was "very strong." Similarly, with respect to Acosta's second trip back to the house, it is unlikely that he was hired merely to bring Maestrey groceries, or that Acosta would have driven four hours from Ft. Myers to Alachua to do this job.

In addition, the jury was also entitled to disbelieve Acosta's testimony that he believed that the officers were robbers – which explained why he ran back into the house and barricaded the door – as the officers consistently testified that they immediately identified themselves. Furthermore, Acosta remained in the house for over four hours, during which time the officers outside repeatedly identified themselves over the PA and told him to come out. The jury was free to disbelieve Acosta's testimony that he did not hear the content of the PA announcements, as there was testimony that the PA was moved close to the house so that the people inside could hear.

In sum, we conclude that the above evidence was sufficient for a jury to conclude that Acosta participated in the marijuana conspiracy. Furthermore, because there was marijuana discovered throughout the house in amounts inconsistent with personal use, and Acosta exercised control over the plants by

17

attempting to destroy and conceal them from law enforcement, there was also sufficient evidence to sustain his conviction for possession with intent to distribute marijuana. See Cruz-Valdez, 773 F.2d at 1544.

## B. Jury Instruction on " Marijuana Plant"

Acosta argues that the district court should have granted him a mistrial because it failed to instruct the jury on the definition of a "marijuana plant." This is so, Acosta contends, because the government charged him with conspiracy to possess with intent to distribute and possession with intent to distribute more than 100 marijuana plants, and a central issue in the case was whether the 84 root balls constituted "marijuana plants."[1]

"We review for abuse of discretion the district court's decision not to grant a mistrial." United States v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007). "A mistrial should be granted if the defendant's substantial rights are prejudicially affected. This occurs when there is a reasonable probability that, but for the remarks, the outcome of the trial would have been different." Id.; see also United States v. Williams, 541 F.3d 1087, 1089 (11th Cir. 2008) ("Error in jury instructions does not constitute grounds for reversal unless a reasonable likelihood exists that it affected the defendant's substantial rights.").

---

[1] Acosta does not contest the 71 intact marijuana plants found in the house.

18

We have held that "cuttings and seedlings are not marihuana plants within the meaning of 21 U.S.C. § 841(b) and U.S.S.G. § 2D1.1(c) unless there is some readily observable evidence of root formation." United States v. Foree, 43 F.3d 1572, 1581 (11th Cir. 1995) (quotations omitted). We pointed out that our "holding on the sentencing issue does not imply, however, that [the defendants] were entitled to a requested jury instruction . . . on this definition of marihuana plant." Id. at 1582 (quotation omitted). This was so because "[t]he proffered instruction had no relevance to anything the government was required to prove," as it was merely required to prove that the defendants "possessed some mature plants" with an intent to distribute, a fact which was not in dispute. Id.

In Foree, however, the indictment merely charged the defendants with possession and conspiracy to possess an unspecified number of marijuana plants. See id. at 1574. In contrast, the indictment in this case charged Acosta with conspiracy to possess with intent to distribute and possession with intent to distribute more than 100 marijuana plants. Thus, to the extent that there was a dispute regarding the number of marijuana plants at issue in this case, the court may have been obligated to issue an instruction. However, we express no opinion on that issue because we conclude that any error was harmless, as the 84 root balls

19

that Acosta challenges constituted "marijuana plants."[2]  See U.S.S.G. § 2D1.1,

comment. (n.17) (defining "plant" as "an organism having leaves and a readily

observable root formation (e.g., a marihuana cutting having roots, a rootball, or

root hairs is a marihuana plant)") (emphasis added); see also Foree, 43 F.3d at

1581 (holding that "cuttings and seedlings are not marihuana plants unless there is

some readily observable evidence of root formation") (quotations omitted).

C.     The Prosecutor's Closing Argument

As mentioned above, "[w]e review for abuse of discretion the district court's

decision not to grant a mistrial." Newsome, 475 F.3d at 1227.  We must determine

whether "the defendant's substantial rights are prejudicially affected . . . in the

context of the entire trial and in light of any curative instruction." Id.; accord

United States v. Mock, 523 F.3d 1299, 1302 (11th Cir. 2008) (imposing the same

requirement in the context of prosecutorial misconduct).  "When a district court

gives a curative instruction, the reviewing court will reverse only if the evidence is

so highly prejudicial as to be incurable by the trial court's admonition." Newsome,

475 F.3d at 1227 (quotation and alteration omitted); see Mock, 523 F.3d at 1320

("[B]ecause the statements made in closing are not evidence, the district court may

---

[2]  Acosta alternatively argues that the government failed to prove that the 84 root balls were not the product of an earlier harvest, but this argument fails because there was testimony that the root balls were fresh and had sap oozing out of them.

20

rectify improper prosecutorial statements by instructing the jury that only the evidence in the case is to be considered.") (quotation omitted). "Furthermore, when the record contains sufficient independent evidence of guilt, any error was harmless." Newsome, 475 F.3d at 1227 (quotation and alteration omitted).

Acosta first asserts that the prosecutor improperly bolstered the credibility of Maestrey by asking whether Maestrey struck the jury as the type of person who was telling the truth. This comment, however, did no more than invite the jury to make a credibility determination, which the district court subsequently instructed the jury to do.

Second, Acosta asserts that the prosecutor impugned the integrity of defense counsel when he stated that, "[d]espite what [defense counsel] said," there were facts establishing that Acosta participated in the conspiracy. Despite Acosta's assertion to the contrary, this remark was not a personal attack on the integrity of defense counsel, but was rather a commentary on the evidence in the case.

Third, Acosta argues that the prosecutor improperly shifted the burden of proof to the defense when he pointed out that Acosta did not produce receipts for the concrete that he allegedly used to install the extension of the pigpen. However, the prosecutor did not tell the jury that Acosta had the burden to produce receipts; instead, this comment was intended to cast doubt on the credibility of Acosta's

testimony and his theory of defense, namely, that he went to the house in order to install a concrete slab. In this respect, the prosecutor's comment was factually supported, as Acosta testified that he purchased the concrete before installing the concrete slab. See United States v. Diaz, 190 F.3d 1247, 1255 (11th Cir. 1999) ("Instead, the prosecutor's remark was a permissible comment based on logical inferences from all the evidence produced at trial."). In any event, even if the prosecutor's comment was impermissible, "the district court's instruction on the burden of proof cured any prejudice." United States v. Paul, 175 F.3d 906, 912 (11th Cir. 1999).

Finally, Acosta contends that the prosecutor distorted the facts by stating that Maestrey testified that Acosta watered the plants, brought in the hoses, and set up the grow operation. However, Maestrey did testify that Acosta brought hoses into the house with Julio. In this respect, the prosecutor could fairly assert that Acosta helped "set up" the grow operation. With respect to watering the plants, the government correctly concedes that the prosecutor misspoke on this point, but Maestrey testified that Acosta brought in hoses and "[v]ery probably" cared for the plants, which, when taken together, support the inference that Acosta did in fact water the plants. See Diaz, 190 F.3d at 1255. In any event, any harm that Acosta may have suffered from the prosecutor's statement was cured when the court

subsequently instructed the jury that statements by the attorneys were not to be considered as evidence. See Newsome, 475 F.3d at 1227 ("The court instructed the jury that the lawyers' statements were not evidence. . . . We find that this curative instruction was sufficient and that any error was harmless."). Furthermore, even absent the prosecutor's comment, there was still substantial evidence upon which the jury could have based its verdict. See id.

### D.    Safety-Valve Reduction

"When reviewing a district court's safety-valve decision, we review for clear error a district court's factual determinations and de novo the court's legal interpretation of the statutes and sentencing guidelines." United States v. Poyato, 454 F.3d 1295, 1297 (11th Cir. 2006) (quotation, ellipsis, and alteration omitted). "The burden is on the defendant to show that he has met all of the safety valve factors." United States v. Johnson, 375 F.3d 1300, 1302 (11th Cir. 2004).

"Safety-valve relief allows for sentencing without regard to any statutory minimum, with respect to certain offenses, when specific requirements are met." Poyato, 454 F.3d at 1297. Specifically, the statute authorizes the court to grant a defendant safety-valve relief:

> if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that . . .
>
> not later than the time of the sentencing hearing, the defendant has

23

truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f)(5); see U.S.S.G. § 5C1.2(a)(5) (same). Thus, "the defendant has an affirmative responsibility to truthfully disclose to the government all information and evidence that he has about the offense and all relevant conduct." Johnson, 375 F.3d at 1302 (quotation omitted).

In this case, the district court did not clearly err by finding that Acosta failed to provide all of the information and evidence that he had regarding his offenses. This is so because a review of Acosta's handwritten statement reveals that it largely reiterated his trial testimony denying his participation in the conspiracy, despite the fact that, as discussed above, there was substantial evidence to establish Acosta's knowing involvement. See United States v. Cruz, 106 F.3d 1553, 1557 (11th Cir. 1997) (concluding that the district court did not clearly err where the defendant's statement "provided little new information" and where the defendant "continued to deny that he knew that the van contained illegal drugs," despite substantial evidence to the contrary). Furthermore, Acosta's statement is devoid of

any details regarding the marijuana conspiracy for which he was convicted.[3]

See id. (requiring the defendant to "includ[e] information relating to the involvement of others and to the chain of the narcotics distribution"); see also Johnson, 375 F.3d at 1302 ("[I]t is the offense for which the defendant is convicted that determines the scope of information which the defendant must disclose.").

### III.

In sum, we conclude that the evidence was sufficient to support Acosta's convictions, Acosta has not shown reversible error in connection with the court's failure to instruct the jury on the definition of a "marijuana plant" or the prosecutor's closing argument, and the district court did not clearly err by denying Acosta's request for a safety-valve reduction.[4]  Accordingly, we affirm.

**AFFIRMED.**

---

[3] Acosta emphasizes that the government refused to accept Acosta's statement.  However, even if the government was required to do so, this would not entitle Acosta to relief because it is the court, not the government, that must find that the defendant has satisfied the statutory criteria.  See United States v. Espinosa, 172 F.3d 795, 797 (11th Cir. 1999).

[4] We also reject without further discussion Acosta's argument that Agent Rosales's isolated and innocuous testimony referencing national origin denied Acosta a fair trial.